IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| JAY CUNNINGHAM, Personal Representative of the ESTATE OF MICHAEL GALINDO, Deceased, )<br>)<br>)<br>)<br>Plaintiff, )<br>)<br>vs. )<br>)<br>BRAD HANSEN, in his official and )<br>individual capacities; SCOTT FRAKES, )<br>in his official and individual capacities; )<br>DOES 1 - 10, in their official and )<br>individual capacities; and STATE OF )<br>NEBRASKA, )<br>)<br>Defendants. ) | Case No. 4:18-cv-3012<br><br><br><br>**COMPLAINT, JURY DEMAND AND DESIGNATION OF PLACE OF TRIAL** |

Jay Cunningham, Personal Representative of the Estate of Michael Galindo, Deceased, by and through his counsel of record, for his cause of action against Defendants, states as follows:

**PARTIES, JURISDICTION AND VENUE**

1.

Jay Cunningham is the duly-appointed Personal Representatives of the Estate of Michael Galindo, Deceased, and is a resident of Buffalo County, Nebraska.

2.

Defendant Brad Hansen ("HANSEN") was, at all relevant times, the Warden of the Tecumseh State Correctional Institution. He is sued in his individual and official capacity. All actions undertaken by HANSEN constituted actions under color of state law. Together, HANSEN and FRAKES were the policymakers and final decisionmakers for the TSCI at all relevant times, and were responsible for articulating, training, and ensuring compliance with official and unofficial

policies for the protection of inmates and any other person inside the secured area of the facility.

3.

Defendant Scott Frakes ("FRAKES") is and was at all relevant times the Director of the Nebraska Department of Correctional Services (NDCS). He is the final policymaker for NDCS and, together with HANSEN, is the final policymaker for TSCI. All of his relevant actions alleged herein were within the course and scope of his employment with NDCS and were taken under color of state law. Together with HANSEN, FRAKES was responsible for articulating, training, and ensuring compliance with official and unofficial policies for the protection of inmates and any other person inside the secured area of TSCI.

4.

DOES are and/or were employed by the Nebraska Department of Correctional Services as correctional administrators, supervisors and/or officers at all relevant times. All of these individual DOE Defendants are liable for their actions in their individual and official capacities. All actions undertaken by any and all of the DOE Defendants constituted actions under color of state law.

5.

This action is brought pursuant to the provisions of 28 U.S.C. §§1331 and 1333 and 42 U.S.C. §1983. The proper venue for this action is the United States District Court for the District of Nebraska because the acts and omissions complained of herein occurred in Tecumseh, Johnson County, Nebraska.

6.

Defendant State of Nebraska is sued pursuant to the Nebraska State Tort Claims Act, following timely submission of an administrative tort claim to the Nebraska State Claims Board in compliance with the administrative requirements of the Nebraska State Tort Claims Act. Plaintiff

asks this Court to exercise supplemental jurisdiction over Plaintiff's cause of action in negligence against STATE, which arises out of the same facts as Plaintiffs' causes of action against individual Defendants, to promote efficiency and to reduce the risk of conflicting rulings.

## INTRODUCTION

7.

The Tecumseh State Correctional Institution (TSCI) is a maximum-medium custody facility for adult males, operated by NDCS. It is located two miles south of Tecumseh, Nebraska in Johnson County. It began receiving inmates in 2001.

8.

As Director of NDCS, Defendant FRAKES is responsible for overseeing the incarceration, supervision and safety of inmates in the NDCS system. This responsibility is shared by Defendant HANSEN, as Warden of TSCI. This responsibility includes the responsibility to understand and identify risks to inmate safety and to take reasonable measures, proactively, to prevent those risks from erupting in reality.

9.

As of March 2, 2017, FRAKES and HANSEN, as well as all DOES, knew NDCS and TCSI in particular to be chronically and dangerously overcrowded, with inadequate staff to manage an increasingly volatile inmate population.

10.

For example, in 2014, NDCS commissioned a Strategic Capital Facilities Master Plan, which found that NDCS facilities were at 150.61% of their capacity. Defendants, and each of them, knew as of March 2, 2017 that overcrowding in a maximum security facility increases tensions and volatility among inmates and staff, and thereby increases the risk of assaults, riots and other group

disturbances resulting in serious injury and death.

11.

NDCS, and TSCI in particular, suffered from understaffing, high employee turnover and mandatory overtime, where correctional staff are required to work additional hours at the beginning or the end of their 12-hour shifts. Defendants, and each of them, knew that this practice leads to fatigue and poor judgment, and thereby increases the risk of assaults, riots and other group disturbances resulting in serious injury and death.

12.

As part of that staffing crisis, there is also inadequate training precipitated by the high turnover. Existing staff are too inexperienced to provide training to new staff. Staff can be assigned to perform duties they have not been trained to perform. These practices, too, increase the risk of assaults, riots and other group disturbances resulting in serious injury and death, a fact that was foreseeable to Defendants, and each of them, before March 2, 2017.

13.

FRAKES has acknowledged that a turnover rate exceeding 15% creates instability; he and HANSEN knew that inadequate numbers and training for correctional staff increases the risk of assaults, riots and other group disturbances resulting in serious injury and death.

14.

As another part of that staffing crisis, TSCI had inadequate programming for the number of inmates it incarcerates. This, too, is well-known by correctional professionals such as FRAKES and HANSEN to increase the risk of assaults, riots, and other group disturbances resulting in serious injury and death.

15.

FRAKES and HANSEN knew that NDCS and TCSI policies, practices and procedures caused an ongoing, constant and substantial risk of serious and avoidable pain, suffering, injury and death, including conscious pain and suffering in the course of death, to TCSI inmates.

16.

On Mother's Day in 2015, a riot broke out among TSCI inmates in Housing Unit 2, a maximum-security unit. It took nearly 10 hours for correctional officers and state troopers to regain control of the housing unit at the heart of the riot. By that time, two inmates had been killed, two correctional staff members were injured, and TSCI sustained more than $2 million in property damage.

17.

The "Mother's Day Riot" was extensively investigated by NDCS, law enforcement, the Nebraska Legislature and the media. Those investigations identified deficiencies in staffing and in NDCS' response to the outbreak, to include protection of inmates from assault and murder during the riot, were identified. Those investigations also identified conditions that led to the Mother's Day Riot, such as overcrowding and inadequate programming. FRAKES and HANSEN were made aware of all of the findings of those investigations, and of the urgent need to correct the identified deficiencies in order to prevent future riots.

18.

Those changes were not made. Every day from the Mother's Day Riot until March 2, 2017, FRAKES, HANSEN and DOES knew that conditions of overcrowding, understaffing, inadequate programming, inadequate training and inadequate plans for responses to riots persisted, and would continue to cause an ongoing, constant and substantial risk of serious and avoidable pain, suffering, injury and death, including conscious pain and suffering in the course of death, to TCSI inmates.

## THE MARCH 2017 RIOT

19.

In March 2017, MICHAEL was an inmate serving a sentence of 12 to 24 years for robbery, forgery and other offenses. He had been incarcerated at TSCI for approximately 3 years. On or about January 26, 2017, MICHAEL's housing assignment was changed, and he was transferred to Housing Unit 2-A.

20.

At about 1:00 p.m. on March 2, 2017, a riot erupted at TSCI. It began when inmates set a fire at Housing Unit 2.

21.

DOES assigned to staff Housing Unit 2 had been entrusted with the responsibility to protect the lives and safety of inmates placed there. But when the fire alarms sounded, DOES left their posts. Defendants, and each of them, knew that emergency response personnel would have to travel to TCSI from other correctional facilities in eastern Nebraska, some as much as 50 miles away. Yet from the time that the disturbance began, at least 30 minutes passed before Defendants even requested emergency response personnel. Instead, Housing Unit 2 was sealed off, so that the inmates assigned to Housing Unit were locked inside with no one to protect them from smoke, fire or each other.

22.

Approximately 90 minutes after the riot began, MICHAEL was attacked by inmates inside Housing Unit 2. Defendants had not, by that time, brought the riot under control, and Defendants did not intervene to protect MICHAEL when he was attacked.

23.

Video surveillance, viewable in real-time by DOES, captured the events of the riot, to include MICHAEL fleeing from Housing Unit 2 to the exercise yard, where he was assaulted by up to 15 inmates. A different camera showed MICHAEL shortly thereafter back inside the housing unit, on the floor and still being assaulted by multiple inmates. When the attack ended, MICHAEL could be seen trying to get to safety, and moving himself off-camera; but Defendants did not take any steps to enter Housing Unit 2 to find this obviously-wounded individual and get him to medical care.

24.

The riot was not brought under control for over 3 ½ hours. Thereafter, MICHAEL was found lying facedown, dead, inside a cell where he had apparently tried to hide from his assailants. His death was determined to be caused by smoke inhalation and multiple sharp- and blunt-force injuries. In fact, the autopsy identified 130 "sharp force wounds" to MICHAEL's head, neck, torso and extremities.

25.

MICHAEL was horrifically assaulted by multiple inmates, while Defendants actually viewed his assault in real-time on video surveillance but did not intervene to save him. MICHAEL suffered the terror of the attack, the terror of realizing no one was intervening to help him, the pain of 130 "sharp force wounds" and smoke inhalation, and the despair and resignation of dying alone and in agony.

26.

By working at TSCI, DOES accepted a job that they knew required them to protect the safety of inmates, even if doing so required them to step into harm's way. Many, if not all, DOES were working during the Mother's Day Riot in 2014 and thus had every reason to know how dangerous a prison riot is to human life when staff fail to intervene.

## FIRST CAUSE OF ACTION

### 42 U.S.C. § 1983 (vs. DEFENDANTS OTHER THAN STATE)

27.

MICHAEL had a right under the United States Constitution to be free from excessive punishment and deliberate indifference to his safety, as well as a right to due process and equal protection, by employees of governmental entities.

28.

At all times relevant to this Complaint, Defendants (other than STATE) were acting under color of law – under the constitutions, statutes, administrative rules, customs, policies and usages of TSCI, NDCS, the State of Nebraska and the United States – and Defendants had assumed the responsibilities, activities and rights involved in exercising their roles as members of NDCS' professional staff.

29.

When MICHAEL was under Defendants' supervision and custody, Defendants acted with deliberate indifference to MICHAEL's known and recognized constitutional and legal rights to be free from excessive punishment, to due process, to bodily integrity, and to be free from deliberate indifference to his safety and medical needs. Deendants actively participated in the deprivation of MICHAEL's constitutional rights by causing MICHAEL's exquisite suffering, terror and death. This includes, but is not limited to:

   a. Defendants' failure to adequately respond to objective warnings of serious risk to inmate life and safety following the Mother's Day Riot;

   b. Defendants' failure to staff TSCI with enough personnel to respond immediately if a riot or other serious disturbance were to break out;

   c. Defendants' failure to timely summon help when the March 2, 2017 riot

    began;

d.  Defendants' decision, on recognizing that a life-threatening disturbance was underway, to protect staff but not inmates in the area of the riot;

e.  Defendants' failure to intervene when MICHAEL was attacked on video; and

f.  Defendants' failure to enter Housing Unit 2 or otherwise take steps to get MICHAEL to safety when MICHAEL was no longer visible on video and was obviously in need of medical treatment.

30.

Defendants' conduct, within their duties as members of NDCS' administration and professional staff and under color of state law, deprived MICHAEL of rights, privileges and immunities secured by the United States Constitution. Particularly, MICHAEL was deprived of his constitutional interests in freedom from excessive punishment, due process, bodily integrity and freedom from deliberate indifference to his safety and medical needs.

## SECOND CAUSE OF ACTION

### 42 U.S.C. § 1983 (vs. DEFENDANTS OTHER THAN STATE)

*Count I – Policy or custom of failing to protect inmate safety*

31.

Defendants (other than STATE) had a special relationship with MICHAEL, by virtue of the fact that Defendants had custody and control over MICHAEL. Due to his incarceration, MICHAEL could take only limited measures for his own safety and could not leave the facility to care for his own medical needs after being assaulted during the March 2, 2017 riot. Defendants, including FRAKES and HANSEN, knew this, and further knew that each had a duty to exercise reasonable care in the selection, training, assignment, supervision and retention of its professional staff, including DOES. This includes informal policies instituted by FRAKES and HANSEN, who had decisionmaking

authority, to fail to provide appropriate housing, staffing, and emergency responders to protect inmate safety and to transport inmates to emergent medical care when the same is needed.

32.

By those failures set forth above, FRAKES and HANSEN acted with deliberate indifference to a known risk of constitutional deprivation to MICHAEL.

33.

As a result of Defendants' deliberate indifference to the risk of deprivation of MICHAEL's constitutional liberty interests, MICHAEL incurred damages as set forth below.

34.

NDCS and TSCI, including FRAKES and HANSEN, had a widespread custom or practice of failing to supervise and tolerating misconduct by employees, to include:

a. Permission for staff to not timely summon emergency responders;

b. Permission for staff to leave inmates unprotected when the inmates were obviously at risk of serious injury and death;

c. Permission for staff to remain outside of a housing unit even when staff could see in real time that inmates were being attacked and were in immediate risk of seroius injury and death;

d. Permission for staff to leave seriously injured inmates alone and at risk of death instead of taking measures to reach those inmates and transport them to medical care; and/or

e. Permission for staff to not correct serious risks to inmate life and safety identified in the investigation of the Mother's Day Riot.

MICHAEL could not reasonably have discovered these customs and practices, including the failure to supervise and the tolerance of employee misconduct, because such knowledge was specifically held by officers and agents of Defendants.

35.

Defendants had a widespread custom or practice of failing to provide adequate staffing to prevent riots, major disturbances and other threats to inmate life and safety. Such failures included the failure, via FRAKES and HANSEN, to provide adequate staffing, by adequately trained individuals, to allow for appropriate observation of and intervention with inmates in order to proactively prevent major disturbances, to appropriately respond to major disturbances and to protect inmate life and safety if a major disturbance were to occur. MICHAEL could not have reasonably discovered these customs or practices, because such knowledge was specifically held by Defendants. Moreover, MICHAEL was incarcerated and not at liberty to attend to his own medical needs, even he had discovered Defendants' harmful customs and practices.

*Count II – Failure to train*

36.

At all times relevant to this Complaint, FRAKES and HANSEN had a custom or practice of failing to train its employees to be observant of and act upon signs and indications of impending major disturbances among inmates, as well as acting upon the outbreak of major disturbances. HANSEN and FRAKES failed to implement training materials and programs related to recognizing and understanding increased risks and threats of riots or major disturbances, and related to the appropriate response if a riot did break out.

37.

Such failures included, but are not limited to:

a. Defendants' failure to train correctional staff to identify and report potential signs of an impending major disturbance or riot (and to not provoke a major disturbance through their own actions);

b. Defendants' failure to train correctional staff in the appropriate response when a major disturbance breaks out

c. Defendants' failure to train correctional staff in the need to immediately summon emergency responders in the event of fire, major disturbances or riots;

d. Defendants' failure to train correctional staff in the need to immediately intervene when an inmate is being assaulted; and

e. Defendants' failure to train correctional staff in the need and procedure to transport a wounded inmate to immediate medical treatment.

38.

By failing to train its employees to recognize warning signs and dangers of riots and major disturbances, and to respond appropriately if a riot were to break out, Defendants acted with deliberate indifference to a known risk of constitutional deprivation to MICHAEL.

39.

As a result of Defendants' deliberate indifference to the risk of deprivation of MICHAEL's constitutional liberty interests set forth above, MICHAEL has incurred damages as set forth below.

## THIRD CAUSE OF ACTION

## NEGLIGENCE (vs. STATE)

40.

During his incarceration, STATE had a duty of care to protect MICHAEL from harms against which he was unable to protect himself. This included the harm of assaults by inmates and harm of correctional staff failing to intervene and obtain medical treatment.

41.

STATE knew or should have known that MICHAEL was at risk of serious harm before the riot broke out, when the conditions precipitating the Mother's Day Riot had not been corrected; when the March 2, 2017 riot broke out; when MICHAEL'ss assault was captured on video surveillance; and when MICHAEL staggered away from the camera with a multitude of fresh

wounds. STATE allowed dangerous conditions to persist and foment, failed to summon assistance when the riot began, failed to intervene when MICHAEL was assaulted and failed to get MICHAEL to medical care after his assault. This was a direct and proximate cause of harm to MICHAEL.

42.

STATE failed to take reasonable measures to protect MICHAEL from harm. Its failures were a direct and proximate cause of MICHAEL's conscious pain, conscious suffering, terror and eventual death.

43.

Pursuant to and in compliance with the Nebraska State Tort Claims Act, Plaintiff filed an administrative claim on or about May 31, 2017. No action was taken on the claim within six months (or thereafter).

### PUNITIVE DAMAGES (vs. DEFENDANTS OTHER THAN STATE)

44.

In addition to compensatory damages, Plaintiff hereby makes a claim for punitive damages against defendants in an amount to be proven at trial for the willful and wanton acts and omissions of Defendants (other than STATE), to include violation of MICHAEL's civil rights, as alleged herein. The acts and omissions of Defendants in this case were so gross and culpable in nature that they constitute reckless indifference and wanton disregard for the law and for the lives and safety of others, including MICHAEL. Defendants committed the acts and omissions alleged herein and subjected MICHAEL to improper treatment that caused MICHAEL to suffer conscious physical and emotional harm so severe that no person should be expected to endure it, culminating eventually in his death. Defendants' actions should be punished, and an example should be made so that these actions and omissions are not repeated.

45.

This instance of reckless and callous indifference to MICHAEL's safety and constitutional rights should be punished through the imposition of punitive damages so as to make an example of conduct that will not be tolerated.

### ATTORNEY'S FEES (vs. DEFENDANTS OTHER THAN STATE)

46.

As a result of defendants' actions as alleged herein, Plaintiff has been required to retain the services of attorneys and are entitled to a reasonable amount for attorney's fee pursuant to 42 U.S.C. § 1988 for those violations covered by the Civil Rights Act.

### **DAMAGES**

47.

The acts and omissions of Defendants as set forth above have resulted in MICHAEL's catastrophic injury, terror, conscious pain and suffering and death. MICHAEL thus seeks recovery for the following damages:

- A. Compensatory damages in an amount to be proven at trial, for MICHAEL's conscious physical and mental pain and suffering;

- B. Compensatory damages for the violation of MICHAEL's rights under the federal and state Constitutions;

- C. Punitive damages to punish and deter the reprehensible conduct alleged in this Complaint;

- D. Attorney's fees; and

- E. The costs of this action and such other and further relief as this Court deems equitable and proper.

**WHEREFORE,** Plaintiff prays for judgment against the defendants as follows:

A. Plaintiff prays for damages in an amount which will fairly and justly compensate for

        MICHAEL's physical and emotional injuries and death and the violation of MICHAEL's civil rights, his pain and suffering and other consequential damages flowing from the violations and torts set forth herein;

B.    Punitive damages in an amount sufficient to adequately punish defendants and to deter future conduct of the type alleged in this Complaint;

C.    For attorney's fees pursuant to 42 U.S.C. § 1988; and

D.    For the costs of this action and for such other and further relief as this Court deems equitable and proper.

### JURY DEMAND AND DESIGNATION OF PLACE OF TRIAL

Plaintiff requests that this matter be tried to a jury in Lincoln, Nebraska.

    JAY CUNNINGHAM, Personal Representative of the ESTATE OF MICHAEL GALINDO, Deceased, Plaintiff,

By: /s/ *Maren Lynn Chaloupka*
Maren Lynn Chaloupka – NSBA # 20864
Chaloupka Holyoke Snyder Chaloupka & Longoria, P.C., L.L.O.
1714 2nd Avenue
P.O. Box 2424
Scottsbluff, NE 69363-2424
Telephone: (308) 635-5000
Facsimile: (308) 635-8000
mlc@chhsclaw.net

   -AND-

Benjamin H. Murray – NSBA #24951
Germer Murray & Johnson
147 N. 4th Street
P.O. Box 87
Hebron, NE 68370
Telephone: (402) 768-7400
Facsimile: (402) 768-7498
ben@gmjlaw.com